IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

## STATE OF TENNESSEE v. DONALD DODD

**Appeal from the Criminal Court for Shelby County**
No. 16-06940    Lee V. Coffee, Judge

————————————————————

**No. W2018-01961-CCA-R3-CD**

————————————————————

A Shelby County jury convicted the Defendant, Donald Dodd, of second degree murder as charged, and the trial court imposed a sentence of twenty-five years at one hundred percent release eligibility. See Tenn. Code Ann. §§ 39-13-210, 40-35-501(i). On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Earnest J. Beasley (on appeal) and Joseph A. McClusky (at trial), Memphis, Tennessee, for the Defendant-Appellant, Donald Dodd.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne L. Bell and Patrick Newport, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

At trial, James Pool, commonly known as "J.P.,"[1] testified that he met Rachel Pool, the victim, in 2004 when he was twenty years old and the victim was sixteen years old, and they began dating. J.P. said that the victim was seventeen years old when she moved in with him and that the victim liked to drink alcohol and take prescription pills.

---

[1] Generally, we refer to witnesses by their last names for the purpose of efficiency. However, because the victim, James Pool, and Renee Pool all share the same last name, we will refer to the victim as "victim" and will refer to the aforementioned witnesses as "J.P" and "Renee," respectively. In doing so, we intend no disrespect.

After the victim and J.P. had their first child, they began having relationship problems because of the victim's substance abuse issues. They later reconciled, and the victim gave birth to their second child. The victim and J.P. married in 2012. J.P. said that he, the victim, and their children lived with his mother, Renee Pool, at her home ("the Pool Residence").

After getting married, J.P. said the victim continued to have substance abuse problems, and in April 2013, the victim received thirty days of in-patient treatment at Lakeside Behavioral Health System ("Lakeside"). At some point, the victim told J.P. that "if she ever was to commit suicide, . . . she would [overdose] on medication like Marilyn Monroe." He acknowledged that this was the only time the victim talked to him about suicide. When the victim relapsed a second time, she returned to Lakeside for sixty days. In 2014, J.P. filed for divorce, which was finalized on April 15, 2015. Pursuant to the divorce, J.P. received full custody of the couple's children, and the victim received supervised visitation with the children.

J.P. said that in December 2015, he and the victim began having contentious conversations about her seeing the children, although the victim was able to see the children the day after Christmas. During this visit, the victim was "sober," looked "healthy," and said she "wanted her family back."

J.P. stated that in January 2016, the victim visited their children at the Pool residence three times. During these visits, the victim looked good, did not seem depressed, and "enjoyed every minute of" the time she spent with their children. The victim was not drinking and was taking her prescription medication as directed. During this time period, J.P. informed the victim that she needed to be a mother to their children before he could consider a reconciliation.

On January 20, 2016, J.P. spoke to the victim, who was staying at her parent's home. He said that the victim "sounded good" and "was excited to come back and see the children." On January 21, 2016, J.P. and the victim discussed their upcoming court date, which concerned issues of custody and the victim's unpaid child support payments. That day, the victim spoke to her children on the phone. At 9:01 p.m. on January 21, 2016, the victim texted J.P. that she loved him, which was her last communication with him prior to her death.

J.P. said the victim was left-handed. He noted that although the Defendant claimed the victim committed suicide, the victim did not like guns, and he had never seen the victim holding or shooting a gun. J.P. said the victim refused to go hunting with him and did not like the fact that he had guns in their home during their marriage.

- 2 -

J.P. said he did not know that the victim was seeing the Defendant until January 2016. When he confronted the victim about the Defendant, she denied having a relationship with him. J.P. acknowledged that in December 2015, the victim had said she was depressed about not seeing the children. Although the victim did not drink alcohol around the children, she had admitted during some of their telephone conversations that she was still drinking. J.P. acknowledged that the victim would go from being completely fine to using drugs and alcohol again. However, J.P. asserted that the victim never said she wanted to kill herself in December 2015 or January 2016. He also said that by late 2015 and January 2016, there were no signs that the victim was still drinking or using drugs. J.P. said that by January 21, 2016, the victim was in good spirits because she had been able to see her children and seemed "completely fine."

Renee Pool, J.P.'s mother, testified that on December 26, 2015, she picked up the victim from her father's home and brought her to the Pool residence to visit her children. During this visit, the victim was "really, really excited" to see her children, and her children were thrilled to see her. Renee said that the victim was "very attentive with the kids" during this visit.

Renee said that between January 16-19, 2016, the victim again visited with her children and cared for them by feeding them breakfast, bathing them, cleaning their rooms, making their lunches, and riding with them to school. Renee said that the victim told her that she wanted her family back during this visit. She said the victim was "in very, very good spirits" and was "clearheaded." Although the victim said she was afraid that she would go to jail because of her unpaid child support, Renee assured her that J.P. would not allow her to go to jail. On the afternoon of January 19, 2016, Renee said the victim told her that she would visit again the next weekend. Renee confirmed that the victim was left-handed.

April Ganong testified that she considered the victim to be her sister because her parents had obtained custody of the victim when the victim was sixteen years old. Ganong said she talked to the victim on the phone in April 2015. During this conversation, the victim "sounded great" and did not seem depressed. Ganong asserted that she had never seen the victim shooting a gun and that the victim did not like guns. When Ganong heard about the victim's death, she thought it "was a joke" because the victim "never [would] have shot herself in the face." She said that if the victim had decided to commit suicide, she "would have overdosed" because "[s]he was very particular about the way she looked" and would not have "want[ed] to mess her face up." Ganong confirmed that the victim was left-handed and that the victim slept with her hands under her face and with her head on her shoulder. Ganong acknowledged that the victim went through good periods and then bad periods when she was drinking and using drugs.

- 3 -

Frank Sprague, the victim's father, testified that the Defendant moved into the victim's home, where he rented a room. Sprague said that although the Defendant said he had fallen in love with the victim and wanted to marry her, the victim told Sprague that "she didn't need another man in her life." He said the victim eventually moved out of her home because the rent was too high and later moved into the Defendant's apartment.

After moving in with the Defendant, the victim would talk to J.P. on the phone, and the Defendant "would get upset" and would argue with her. Toward the end of 2015, J.P. began allowing the victim to have supervised visits with their children. When the victim went to the Pool residence to visit her children, the Defendant would often call Sprague looking for her. Around Thanksgiving 2015, Sprague and his wife spent time with the victim and the Defendant at their apartment. During this visit, J.P. called the victim on the phone, and the Defendant "got upset." Later in that visit, the Defendant told Sprague he "took a bunch of pills" because seeing the victim talking to J.P. "made him want to kill hi[m]self."

Sprague said that on January 21, 2016, the victim came to his house after staying at the Pool residence for three or four days. During this visit, the victim asked Sprague if he thought she should reconcile with J.P., and Sprague told her that he "had no problem with it" and that "it was up to her." He said the victim "was going to go back with [J.P.,] but she wanted them both to go to counseling. Sprague believed that J.P. also wanted to reconcile with the victim. On January 21, 2016, the victim "seemed fine" and planned to visit her children the next day. Sprague said the Defendant had texted the victim that "whole afternoon before he got off work," asking the victim to return to his apartment, even though she did not want to go back there. Around 7:00 p.m. on January 21, 2016, the Defendant picked up the victim, and Sprague rode with them to the store. When Sprague returned to the Defendant's car after completing his shopping, he "could see and hear" the Defendant and the victim arguing, although he could not tell what was being said. He noted the victim "snapped" at him when he got into the car, which she would not have done if she and the Defendant had not been arguing. Sprague said that the Defendant and the victim dropped him off at home, and this was the last time he saw the victim alive.

Sprague said that the victim never mentioned anything about committing suicide because she "wanted her kids" and "loved her kids." He did not recall telling Sergeant Wilkie that the victim had not talked about suicide in a long time. He acknowledged that the victim had substance abuse problems and had received treatment at Lakeside in May 2013. He said that although the victim had an upcoming court date regarding child support she owed to J.P., she was not upset about this court date because she planned to reconcile with J.P..

- 4 -

During trial, the court admitted a stipulation, stating that both parties had agreed that the Defendant's January 21, 2016 9-1-1 call was obtained from the records kept by the Memphis Police Department's Communication Bureau. The court also admitted a CD containing the 9-1-1 recording, which was played for the jury.[2]

Officer Philip Perez of the Memphis Police Department ("MPD") testified that he was the first officer to arrive at the scene of the victim's shooting on January 21, 2016. When he arrived, he noted that the door was open to the apartment shared by the Defendant and the victim and that the Defendant was yelling, "She shot herself. She shot herself." Officer Perez entered the apartment and saw the victim, who was bleeding and unresponsive, lying on her back on a blue couch. The victim's legs were on the couch, and her head was on a pillow near one of the arms of the couch. At first, Officer Perez did not see a gun near the victim.

After the victim was transported to the hospital, Officer Perez examined the couch where the victim had been found and saw a pistol in the area where the victim's legs had been. He noted that "[t]he [pistol's] magazine was part of the way out" and the pistol did not have much blood on it. When Officer Perez asked the Defendant what happened, the Defendant said

> he was sitting on one couch playing video games, and that [he and the victim] were discussing her losing custody of her children in a divorce that she was going through, and that he was offering to get her a lawyer to help her out with that. He said they had both been drinking, and she got angry and said she didn't want his help. And then she reached and grabbed his gun that was laying [sic] on the table between the two sofas that they were on, and that she shot herself.

Officer Perez said that the Defendant's demeanor during their conversation was "over[ly] dramatic" and that the Defendant "attempted to cry but wasn't crying[,]" which he thought was a little odd. At the time, the Defendant had blood on his hands and kept wanting to wash his hands.

Officer Matthew Christopher of the MPD testified that he also saw a pistol on the couch when the paramedics removed the victim from the apartment. He said the gun was "fairly clean," which was unusual under the circumstances. He also noted that the Defendant "wasn't really covered in blood" and "wasn't really disheveled[,]" which he thought was "a little odd" given that the Defendant had allegedly witnessed the victim's suicide. Officer Christopher said the Defendant mentioned that he was playing a video

---

[2] The recording of the Defendant's 9-1-1 call was not included in the record on appeal.

game at the time the victim shot herself, and he noted that the video game had been paused, which he thought was odd because most people would not have stopped to pause a video game after witnessing a suicide.

Jamie Clements, a paramedic with the City of Memphis, responded to the scene of the shooting. As he entered the apartment, he noticed that the Defendant was standing with two police officers on the right side of the room, and the victim was lying flat on her back on a couch on the left side of the room. He said the victim's left arm and leg were hanging off the couch. At the time, the victim was struggling to breathe and had "a [gunshot] wound that was in the top of her nostril on the right side that was exiting out the back of her neck." Clements observed that the victim's "pupils were fixed and dilated" and that she was coughing up blood, which indicated trauma. When Clements and the other paramedics picked up the victim to transport her to the hospital, he saw a gun "under [the victim's] right thigh and buttocks area."

Clements stated that the angle of the victim's wound was unusual for a suicide. He noted that generally, when a person commits suicide by shooting themselves in the head, they shoot into their mouth or through the side of their head. Clements believed that it would be difficult for the victim, who was left-handed, to shoot herself in the face to create the wound that existed because the victim would have had to cross her body to shoot the gun, which would have created "a very hard angle" in which to pull the trigger. He observed that female suicide victims who shoot themselves usually shoot into their chest, hitting their heart. He also said that very rarely are there witnesses to a suicide. Although Clements acknowledged that it was "possible" for the victim to have used two hands or her thumb to pull the trigger, he asserted that it would have been "illogical" for the victim to have shot herself that way. He said he told the police that the angle of the victim's wound was suspicious.

Sergeant Tim Monistere with the Crime Scene Unit of the MPD testified that he arrived on the scene shortly after midnight on January 22, 2016, just after the victim had been transported to the hospital. Upon learning that the Defendant had consented to a search of his apartment, Sergeant Monistere took photographs of the crime scene, collected evidence, and created a sketch of the scene. He said that at first, he believed the victim's death was an attempted suicide because the Defendant had reported the incident as an attempted suicide and because the scene initially appeared to be an attempted suicide. Sergeant Monistere said he saw a .40 caliber semi-automatic pistol lying on the couch inside the apartment, which he thought was an "odd location[.]" He also observed a spent .40 caliber shell casing that was on the ground. In addition, Sergeant Monistere noticed that the magazine clip for this pistol had been "partially ejected" and the gun "appear[ed] to have some blood on it, but not much." He said that the pistol's magazine,

which had the capacity to hold eleven bullets, held nine live rounds at the time he collected it. He also said that there was no round in the chamber of the pistol.

Sergeant Monistere observed several areas of blood near the couch. In two of these areas, the blood had pooled. However, in a third area, which was in front of the couch, the blood was in a "misting pattern[,"] which indicated that the blood had hit the floor at a higher speed. He stated that location of the blood misting pattern was important because it gave him an idea of where the victim may have been when she was shot. Sergeant Monistere explained that if the victim had been sitting upright on the couch at the time she was shot, as the Defendant claimed, the blood misting pattern would have been on the curtains behind the couch, not on the floor in front of and to the side of the couch. He also said that "[i]f someone shoots themselves at close range, . . . the blood can back sp[]atter on a normal basis, and you . . . see little specks [of blood] . . . on the barrel of the gun." However, he did not see any blood spatter on the barrel of the pistol found at the scene. He noted that the spent shell casing was found near the small misting pattern of blood on the floor. Sergeant Monistere also found a spent bullet embedded in the back of the couch, but this bullet did not have any visible blood on it.

Sergeant Richard Borden with the Felony Response Unit of the MPD testified that when he arrived on the scene, the Defendant consented to a search of his apartment. Later, around 2:30 a.m. on January 22, 2016, the Defendant also gave him a formal statement. In this statement, the Defendant, who was not under arrest at the time, claimed that the victim shot herself. The Defendant described the circumstances surrounding the victim's death:

> We were in [the] living [room] watching You[T]ube videos. She had talked to her kids a couple of hours before on the phone and she got upset. I was telling her [that] we were going to get her a lawyer and she was saying she wanted to do it on her own. I got up for a second to go to the bathroom. When I came back from the bathroom[,] she had my gun in her hand. She was just looking at me[,] and I couldn't get to her in time before she shot herself.
>
> . . . .
>
> I panicked and grabbed her head (scooped her up) trying to get her to talk to me. I didn't know what to do. I grabbed my phone and called 911. I grabbed something. I don't know what it was because I was so upset. But, I grabbed something and held it against her head to try and stop the bleeding. I just held it there until the ambulance got there.

- 7 -

The Defendant said that the victim was upset "[b]ecause she had lost custody of her kids to her ex-husband and she had a court date coming up in February." He also said that he and the victim had been drinking and that the victim regularly took Xanax. The Defendant claimed that several months earlier, the victim had "said that her kids would be better off without her[,]" but he acknowledged that the victim had not "really said anything about that again." He also said the victim told him "she couldn't keep doing the back and forth and only getting to see her kids for a couple of days" and that "she was going to drink [on] her court date." Sergeant Borden noted that the Defendant never mentioned anything about the 9-1-1 operator telling him to make the gun safe. He acknowledged that during his formal statement the Defendant was cooperative and tried to answer his questions.

Sergeant Michael Coburn with the Crime Scene Unit of the MPD testified that he processed the .40 caliber Stoeger pistol as well as the pistol's magazine, the live rounds, and a pill bottle that were collected from the scene. He observed a substance that he believed to be blood just below the serial number and near the rear side of the pistol. He then processed the pistol with "a latent blood stain reagent" and saw evidence of additional blood on the gun. Because the reagent indicated the presence of blood in areas that were not visible to the naked eye, Sergeant Coburn concluded that someone possibly wiped off the handgun.

Dr. Marco Ross, the interim Chief Medical Examiner and forensic pathologist at the West Tennessee Regional Forensic Center, was declared an expert in the field of forensic pathology. He testified that he conducted the victim's autopsy on January 23, 2016. At the time of the victim's death, she was five foot, three inches tall and weighed 113 pounds. Dr. Ross's external examination of the victim revealed "a gunshot wound to her head with an entrance wound just to the right of the bridge of the nose, and an exit wound on the back of her head . . . in the upper neck region on the left side." He said there was soot around the edges of the wound and "extending outward a little bit from the edges of the wound," which indicated that this was "not a contact wound" but a "close range wound." He did not observe any stippling on the wound, which suggested that the victim had sustained this wound at close range. He opined that the pistol was approximately one-half inch to one inch away from the surface of the victim's skin when it was fired.

Dr. Ross said the victim sustained a second wound to "her torso with the entrance wound on the top of her left shoulder and [the] exit wound on the upper back." There was no soot or stippling on this wound. He said this second wound "potentially could have been part of a continuation from the gunshot wound of the head." However, in order for this to have happened, the victim's "body would have to have been contorted in such a way that her left shoulder was brought across the front of her body to a significant

- 8 -

degree with her head angled back and towards [sic] the left in order to make the wounds line up." Dr. Ross also observed two abrasions near the shoulder entrance wound. He said that "if this [wa]s a reentry wound of the same bullet that exited the neck, . . . the positioning of [the victim's] head and shoulder would be such that the skin edges probably folded up a little bit in that area" and "as the bullet "exit[ed] the neck and then [went] into the shoulder, the skin edges in that area g[o]t pushed together[,]" causing the two abrasions to the shoulder.

During Dr. Ross's internal examination of the victim, he noted that the bullet traveled through the facial bones of the victim's skull and exited on the left side of her upper neck. The bullet injured the victim's internal carotid artery and caused fractures to her skull and "bruising of the surface of the brain on the left side[.]" He said the bullet's trajectory of the first injury to her head and neck was "from her front towards [sic] her back, slightly downward, and slightly from her right towards [sic] her left." He stated that the gunshot wound to the victim's head was fatal.

Regarding the gunshot wound to the victim's torso, Dr. Ross said that the "entrance wound on her shoulder and the subsequent bullet track through her back and exit wound on the back caused injuries mainly to the underlying fatty and muscular tissues of the back." It also caused injuries to the victim's left shoulder blade. He stated that the trajectory of the second injury to her shoulder and back "was downward and from her left towards [sic] her right."

Dr. Ross used a trajectory rod to show the path of the bullet through the victim's head wound and shoulder wound. He acknowledged that although it was "relatively difficult" to position the victim's body so that the trajectory path of the head wound lined up with the trajectory path of the shoulder wound. However, Dr. Ross opined that "more likely than not," the victim's injuries were "the result of one gunshot wound." He explained that if the victim shot herself twice, she would have had to shoot herself in the shoulder first because the second shot to the head was fatal. He also said that if the victim had fired one shot, she would have had to have pulled her head backward and pulled her shoulder across her body. Dr. Ross said that he did not believe the victim "would have been able to have shot herself if she was holding the gun with [her] left hand." He noted that if the victim were right-handed, it would have been possible for her to cause that wound; however, he said that she still would have had to pull her head backward and her shoulder across her body. He opined that if the victim had been lying down on the couch sleeping with her head on her left shoulder, it would have been possible for a single gunshot fired by someone else to cause the victim's injuries.

Dr. Ross said that he did not see any "track marks" from drug use on the victim's body and did not see any gun powder on the victim's hands. In addition, he did not see

any gunshot residue or soot on the victim's clothing. A toxicology test showed that the victim had both alcohol and Xanax in the blood at the time of her death. The victim's blood alcohol concentration of 0.291% indicated that the victim was intoxicated at the time of her death. Ultimately, Dr. Ross concluded that the victim's cause of death was "a gunshot wound to the head" and her manner of death was "a homicide." He said that the "nature of the wounds, their locations [we]re inconsistent with this being a self-inflicted wound." Although Dr. Ross acknowledged that it was "[n]ot outside the realm of possibility" that the victim could have been holding the pistol with her right hand at the time she fired it, he reiterated that "the locations of the wounds and their trajectories were entirely atypical for any of the suicides that [he] ha[d] ever seen before."

Sergeant Robert Wilkie with the Homicide Bureau of the MPD testified that he was assigned to the victim's case as the lead investigator after Dr. Ross informed the police that "his autopsy was inconsistent with a suicide[.]" Sergeant Wilkie reviewed the photographs from the crime scene and noted the following unusual circumstances: the magazine of the pistol was partially ejected from the gun; the pistol's hammer was back; the pistol's slide was "all the way forward[,]" and the pistol did not have a bullet in the chamber. He said these circumstances indicated that "someone had manipulated the weapon." He also noted that the pistol did not have much blood on it. In addition, Sergeant Wilkie thought it was unusual that there was only a small amount of blood on the couch where the bullet had exited the victim's body. He said that because the bullet went through several areas of the victim's body, "there should have been some blood either on that light blanket [under the victim] or on the bullet itself." Sergeant Wilkie observed that there was a drop of blood on the magazine itself, which indicated that the magazine had been manipulated after the victim's blood had been spilled. He stated that because the reagent showed the existence of blood or a cleaning agent on the pistol, this indicated that the pistol "had been cleaned."

Sergeant Wilkie also reviewed the initial report submitted by the responding officers as well as the statements made by the Defendant. He noted that although the Defendant had initially told officers at the scene that he was playing video games when the victim grabbed the gun and shot herself, he later gave a formal statement in which he said he was coming out of the bathroom, glanced over, and the victim was holding the gun and shot herself. Sergeant Wilkie said that the responding officers told him that although the Defendant had blood on his hands, he did not have blood on his clothes, which was odd because the Defendant claimed he had "scooped" the victim up in his arms after she shot herself.

Sergeant Wilkie met with the Defendant on February 13, 2016, and had him sign an advice of rights form. During this interview, the Defendant appeared calm, but his hands were shaking. The Defendant first stated that the victim, who was sitting upright

on the edge of the couch, shot herself as he was coming out of the bathroom. The Defendant said that the victim had received a phone call or text from her ex-husband three or four hours earlier that may have upset her and that they were drinking. He asserted that only one shot was fired. However, the Defendant admitted that the victim had never touched his gun before she committed suicide.

Sergeant Wilkie informed the Defendant that based on the evidence from the autopsy, the victim could not have been sitting upright on the couch when she was shot, which prompted the Defendant to say that he was coming out of the bathroom and the victim was "seated fully on the couch" and that after the shot was fired, the victim "kind of lean[ed] back into the position [in which] she was found." Sergeant Wilkie then told the Defendant that there were two shots and that he "didn't think [the victim] had shot herself." At that point, the Defendant gave a different version of events in which "he's coming out of the bathroom, he glances over at her, and she's holding the gun, and he hears the first shot. He rushes over to her, and he's trying to grab the gun from her as she's holding it with both hands . . . and pointing it at her own face, and that he goes to grab it, and then it goes off." The Defendant also said that the victim had the gun in her hands with her arms fully extended when it went off. Sergeant Wilkie noted that although the Defendant claimed the victim was sitting upright on the couch when she was shot, the back of the couch had no blood on it.

Sergeant Wilkie next told the Defendant that the gun had been wiped off, and the Defendant responded that "he would never hurt" the victim and that "he didn't do anything to the gun." When Sergeant Wilkie said that the medical examiner had concluded that it was a "close-up wound," the Defendant replied that he "wasn't sure how far away" the gun was when it went off and that he and the victim were having a "tug-of-war over the gun[.]" After Sergeant Wilkie gave the Defendant a bathroom break and something to drink, the Defendant said that "he believed the 9-1-1 dispatcher had told him to make the gun safe[,]" so he ejected the magazine and took the round out of the chamber.

Sergeant Wilkie said the Defendant then gave him a written statement, wherein he provided the following description of the events leading to the victim's death:

> We were just watching TV and drinking Crown Royal and everything was fine until later when I came out of the bathroom and she had the gun. I didn't notice the gun until I heard the first shot. Once I saw that she had the gun I tried to get it away from her. I grabbed her hand and the gun and tried to get it away from her and as I was pulling it out of her hand, it went off. I tried to hold her and talk to her, but she didn't respond to me. I called 911 and asked the lady what I could do for her and to hurry.

> She asked me about the gun and I put the safety on and made it safe and put it back on the couch. I just held a blanket to the back of her head until the police arrived.

Sergeant Wilkie said the Defendant told him he made the gun safe by putting on the safety and by pulling the slide back to make sure a round was not in it, and by ejecting the magazine. He added that he did not know how much knowledge the victim had about handguns but that she had said she shot guns with her ex-husband. The Defendant said he had received treatment at Lakeside for depression after people accused him of murdering the victim. He denied going back to his apartment after the victim's suicide and claimed that his apartment should be in the same condition as it was the night of the victim's death. After giving his formal statement, the Defendant was arrested.

Sergeant Wilkie said that after the Defendant asserted that there were two shots fired, he executed a search warrant of the Defendant's apartment. His investigation later revealed that the Defendant and his sister had gone back to the apartment to remove the couches and clean, even though the Defendant claimed he had not returned to his apartment since the victim's death.

## ANALYSIS

The Defendant argues that the evidence is insufficient to sustain his second degree murder conviction. Specifically, he claims that the State failed to "rule out the possibility of suicide" and provided "no conclusive proof . . . as to [his] state of mind." The State counters that when the facts presented at trial are viewed in the light most favorable to the prosecution, a rational jury could have found the Defendant guilty as charged. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). So long as the evidence of the defendant's guilt is established beyond a reasonable doubt, the proof need not exclude every other reasonable hypothesis except that of the defendant's guilt. Id.

The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Second degree murder is defined as "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210(a)(1), and is a result-of-conduct offense, State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015). As relevant in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-

11-302(b). "[T]he proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused 'knew that his or her actions were reasonably certain to cause the victim's death.'" State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011) (quoting State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010)). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). A jury may infer that a defendant acted knowingly from the surrounding facts and circumstances. Brown, 311 S.W.3d at 432; see Inlow, 52 S.W.3d at 105 ("Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.").

In reviewing this case, we note that the overwhelming evidence presented at trial indicated that the victim's death was the result of a homicide rather than a suicide. J.P., Renee, and Frank Sprague all testified that the victim showed no signs of being suicidal and was excited at the prospect of spending more time with her children. J.P. and April Ganong both testified that if the victim were to commit suicide, she would have overdosed on drugs rather than shot herself because she did not like guns. The testimony from all of these witnesses demonstrated that the victim's life was improving, rather than worsening, at the time of her death.

The proof also showed that the Defendant was extremely concerned about the victim reconciling with her ex-husband and that he argued with her just a few hours before her death. Sprague testified that the Defendant told him he loved the victim and wanted to marry her, even though the victim had told Sprague that she did not need another man in her life. Sprague noted that when the victim talked to J.P. on the phone, the Defendant would get upset and would argue with her and that when the victim visited with her children at the Pool residence, the Defendant would often call him looking for her. Sprague stated that around Thanksgiving 2015, the Defendant told him that "he took a bunch of pills" because seeing the victim talking to J.P. "made him want to kill hi[m]self[.]" He added that on January 21, 2016, the Defendant repeatedly texted the victim, asking when she would return home. Around 7:00 p.m. that night, just a few hours before the victim's death, Sprague rode with the Defendant and the victim to the store, and when he returned to the car he "could see and hear" the Defendant and the victim arguing.

The Defendant's behavior at the scene and his varying statements to police also indicated he was not being truthful about the cause of the victim's death. Officer Perez testified that the Defendant's behavior was "over[ly] dramatic" and that the Defendant "was attempting to cry but wasn't crying[,]" which he thought was odd. Officer Christopher testified that he found it unusual that the Defendant was not covered in blood, even though he claimed he witnessed the victim committing suicide. Sergeant

- 14 -

Wilkie testified that the Defendant gave him several different versions of the events leading to the victim's death. Sergeant Wilkie testified that although the Defendant had told officers at the scene that he was playing video games when the victim grabbed a gun and shot herself, the Defendant later gave a formal statement, wherein he said that he was coming out of the bathroom, glanced over, and the victim was holding the pistol and shot herself. Sergeant Wilkie said that when he informed the Defendant that the medical proof showed that the victim could not have been sitting upright on the couch when she was shot, the Defendant changed his story, claiming that the victim was "seated fully on the couch" and that after she fired the shot, the victim "kind of lean[ed] back into the position [in which] she was found." When Sergeant Wilkie told the Defendant that there were two shots fired and that he did not believe the victim had shot herself, the Defendant gave an entirely different version of events in which he saw the victim holding the gun, heard the first shot, and then rushed over to her and, as he and the victim were having a "tug-of-war" over the gun, the gun went off as the victim was holding it with both hands. Sergeant Wilkie stated that although the Defendant told him he had not returned to his apartment since the victim's death, Sergeant Wilkie's investigation later revealed that the Defendant and his sister removed the couches and cleaned the apartment before a search warrant was executed.

The location of blood on and near the couch and the presence of blood on the pistol also support a conclusion that the victim's death was a homicide. Sergeant Monistere testified that he found a .40 caliber semi-automatic pistol lying on the couch, which he thought was an "odd location." He also found two areas of pooled blood and one area of misted blood near the couch. He said that if the victim had been sitting upright on the couch at the time she was shot, as the Defendant claimed, the area of misted blood would have been on the curtains behind the couch, not on the floor in front of and to the side of the couch. He also noted that if the victim had committed suicide, then he would have probably found blood spatter on the barrel of the gun, although there was no such blood spatter on the pistol. Sergeant Coburn testified that when he processed the pistol with a blood stain reagent, he saw evidence of blood in areas that were not visible to the naked eye, which indicated that someone had wiped the handgun off. Sergeant Monistere testified that the pistol's magazine had been "partially ejected" and appeared to have a small amount of blood on it, but not much. Sergeant Wilkie said that his review of the crime scene photographs showed that the magazine of the pistol was partially ejected, the pistol's hammer was back, the pistol's slide was "all the way forward[,]" and the pistol did not have a bullet in the chamber, which indicated that "someone had manipulated the weapon." He said that because there was a drop of blood on the magazine itself, this indicated that the magazine had been manipulated after the victim's blood had been spilled.

Most importantly, the medical evidence indicated that the victim's death was a

homicide rather than a suicide. J.P., Renee, and April Ganong all testified that the victim was left-handed. Ganong said that the victim often slept with her hands under her face and her head on her shoulder. Jamie Clements, the paramedic, testified that it would be difficult for the victim, who was left-handed, to shoot herself in the face to create the wounds that existed because the victim would have had to cross her body to shoot the gun, which created "a very hard angle" in which to pull the trigger. Dr. Ross testified that the victim's cause of death was "a gunshot wound to the head" and her manner of death was "a homicide." He stated that "more likely than not," the victim's injuries were the result of a single gunshot. Dr. Ross said he did not believe the victim "would have been able to have shot herself if she was holding the gun with [her] left hand." However, he opined that if the victim had been lying down on the couch sleeping with her head on her left shoulder, it would have been possible for a single gunshot fired by someone else to cause the victim's injuries. The photographs of the trajectory rod in the victim's wounds, which were admitted at trial, fully support this conclusion. Ultimately, Dr. Ross stated that "the nature of the wounds, their locations [we]re inconsistent with this being a self-inflicted wound." Based on this proof, a rational jury could have found beyond a reasonable doubt that the Defendant shot the victim in the head while she was lying, and likely sleeping, on the couch, that he wiped off the handgun, and that he called 9-1-1 in order to make the victim's death look like a suicide.

The Defendant argues the evidence is insufficient to sustain his conviction because his case "was decided almost entirely on circumstantial evidence[.]" Quoting extensively from State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971), he asserts that "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." The Defendant argues that because a "reasonable trier of fact could determine that the victim committed suicide, and the [S]tate could not rule out the possibility of suicide[,]" the evidence is insufficient to sustain his conviction for second degree murder. As support for his claim, the Defendant references the testimony of the responding officers, who believed the call to be a suicide. He also emphasizes his own statements, wherein he consistently maintained that the victim shot herself. Finally, he refers to paramedic Jamie Clements's testimony that it was "possible" for the victim's wounds to be self-inflicted and Dr. Ross's testimony that it was "not outside the realms of possibility" that the victim committed suicide.

In relying on Crawford, the Defendant fails to recognize that the Tennessee Supreme Court overruled Crawford when it decided State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011). In Dorantes, the court explicitly rejected the view in Crawford that the State is under an affirmative duty to rule out every reasonable hypothesis except that of guilt beyond a reasonable doubt. Id. at 380. The Court reiterates that so long as the evidence of the Defendant's guilt is established beyond a reasonable doubt, as it was in

this case, the proof need not exclude every other reasonable hypothesis except that of the Defendant's guilt. See id.

The defense theory at trial was that the victim committed suicide. Although the Defendant argues that the State failed to rule out the possibility of suicide, we conclude that there was more than sufficient evidence to support the State's theory that the Defendant knowingly shot and killed the victim. While Clements acknowledged that it was "possible" for the victim to have used two hands or her thumb to pull the trigger, he asserted that it would have been "illogical" for the victim to have shot herself that way. Moreover, while Dr. Ross acknowledged that it was "[n]ot outside the realm of possibility" that the victim could have been holding the gun with her right hand at the time she fired the pistol, he asserted that "the locations of the wounds and their trajectories were entirely atypical for any of the suicides that [he] ha[d] ever seen before." While there was some conflicting evidence as to whether the victim committed suicide, the jury rejected the defense's theory of suicide in favor of the State's theory that the Defendant knowingly killed the victim. The jury, by its verdict, clearly resolved any inconsistencies in the proof in favor of the State, and this court will not re-weigh the evidence or substitute its inferences for those drawn by the jury. Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659).

Finally, the Defendant contends that the evidence is insufficient to sustain his conviction because the State put forth no conclusive proof regarding his state of mind at the time of the killing and only presented evidence that "he was distraught[,]" which some of the officers found to be "odd." We conclude that the proof, when viewed in the light most favorable to the State, is sufficient to show that the Defendant committed a knowing killing of the victim. As we have previously detailed, there was substantial evidence of the Defendant's guilt, which consisted not only of direct evidence in the form of the Defendant's varying statements concerning the victim's death but also of persuasive circumstantial evidence, which included Frank Sprague's testimony that the Defendant argued with the victim hours prior to her death, Dr. Ross's expert medical testimony that the victim's wounds were not self-inflicted, and Sergeant Coburn's testimony that the pistol had likely been wiped off. Although the defense theory at trial was that the victim committed suicide, the jury ultimately rejected this theory and accredited the witnesses for the State. Given all the evidence presented at trial, a rational jury could have concluded that the Defendant knew his conduct in shooting his pistol at the victim's face was reasonably certain to cause the victim's death. Accordingly, we conclude that the proof is sufficient to sustain the Defendant's conviction for second degree murder.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE